IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MICHAEL KANAVICH,** | : |
| *Plaintiff*, | : Case No.: 2:22-cv-1366 |
| v. | : |
| **XPO LOGISTICS FREIGHT, INC.,** | : |
| *Defendant.* | : |

## COMPLAINT IN CIVIL ACTION

AND NOW, comes Plaintiff, Michael Kanavich, by and through the undersigned counsel, J.P. Ward & Associates, LLC. and, specifically, Sammy Sugiura, Jr., Esquire, who files the within Complaint in Civil Action against Defendant, XPO Logistics Freight, Inc., of which the following is a statement:

## PARTIES

1. Plaintiff, Michael Kanavich (hereinafter "Mr. Kanavich" or "Plaintiff"), is an adult individual who currently resides at 125 Congress Street, Apartment 202, White Oak, PA 15131.

2. Defendant, XPO Logistics Freight, Inc., (hereinafter "XPO"), formerly Con-Way Freight, Inc., is a corporation with a place of business located at 369 Leger Road, Irwin, PA 15642.

## JURISDICTION AND VENUE

3. Jurisdiction is proper as Plaintiff brings this lawsuit under the Americans with Disabilities Act Amendments Act (hereinafter "ADA"), 42 U.S.C. § 12101, *et seq.*, and the Pennsylvania Human Relations Act (hereinafter "PHRA"), 43 Cons. Stat. § 951 *et seq.*

1

4. Plaintiff is a resident and citizen of Pennsylvania, a substantial part of the events or omissions giving rise to the claims occurred in Western Pennsylvania, and, therefore, this action is within the jurisdiction of the United States District Court for the Western District of Pennsylvania and the venue is proper pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

5. In April 2004, Mr. Kanavich began his employment with XPO Logistics Freight, Inc., formerly Con-Way Freight, Inc.

6. In 2015, Mr. Kanavich was formally diagnosed with Asperger syndrome.

7. Mr. Kanavich's disability substantially limits one or more major life activities.

8. However, at all times relevant, Mr. Kanavich was able to perform the essential duties of his job. In fact, Mr. Kanavich worked for Defendant for approximately 16 years, and during that period, he was promoted several times.

9. In February 2018, Mr. Kanavich began working on the third shift when he was promoted to the position of Freight Operations Supervisor.

10. Upon his transfer to the third shift, Mr. Kanavich was informed that Freight Operations Manager, Anthony Washington (hereinafter, "Mr. Washington"), was withholding resources that Mr. Kanavich needed to perform his job. As a result, Mr. Kanavich experienced a backlog in work and was forced to work over 10 hours per day.

11. One of Mr. Kanavich's direct supervisors, Service Center Manager, James Sears (hereinafter, "Mr. Sears"), discussed the resources issue with Mr. Kanavich. During this discussion, Mr. Sears stated that he recognized that Mr. Kanavich's work-related struggles were directly attributable to the resources issue noted above.

12. It is believed that Mr. Sears spoke with Mr. Washington about his allocation of tow motors and forklifts.

13. Thereafter, Mr. Kanavich was subjected to heightened scrutiny by Mr. Washington. Despite this heightened scrutiny, Mr. Kanavich continued to perform all his essential job duties.

14. In July 2018, Mr. Kanavich received a positive performance review from Mr. Sears along with a pay raise.

15. Although Mr. Kanavich was thankful for the acknowledgment of his hard work, he informed Mr. Sears that he felt overwhelmed by the lack of resources and excessive work hours and that he was "barely keeping his head above water."

16. Despite Mr. Kanavich's concerns, Defendant made no effort to provide him with the tools needed to efficiently perform his job duties or any additional assistance.

17. Upon information and belief, Mr. Washington had taken steps to prevent the company from providing Mr. Kanavich with the tools he needed to better perform his job duties.

18. Thereafter, Mr. Kanavich was placed in a newly created Freight Assembly Coordinator role.

19. Upon information and belief, Mr. Kanavich was transferred to this new role by Mr. Washington because he no longer wanted to work directly with him.

20. Defendant never provided Mr. Kanavich with any training specific to this new role. In addition, Mr. Kanavich received a disproportionately high workload and was forced to work several overtime hours per week.

21. In December 2020, Mr. Kanavich conducted a self-appraisal of his 2020 work performance to be submitted to Mr. Washington.

22. Mr. Kanavich pointed out he was the only supervisor to work 10 or more hours per day and reiterated he was overwhelmed by the disproportionate amount of work he was assigned compared to his coworkers.

23. Although Mr. Washington agreed Mr. Kanavich was assigned a disproportionately high amount of work, Defendant took no steps to address this issue or assist Mr. Kanavich.

24. On April 6, 2021, Mr. Washington berated Mr. Kanavich in front of drivers and dock workers.

25. Thereafter, Mr. Washington sent Mr. Kanavich multiple emails where he continued to aggressively criticize Mr. Kanavich for his alleged unsatisfactory work performance.

26. Mr. Kanavich expressed his concerns with Mr. Washington's heightened scrutiny of his work performance and conduct.

27. Mr. Washington eventually apologized for berating Mr. Kanavich.

28. Later in the month, in April 2021, Mr. Kanavich was placed on a PIP by Mr. Washington due to his 2020 review score.

29. Upon information and belief, all employees' performance reviews are graded on a scale of 1-3.

30. Mr. Kanavich received an overall score of 2, which was primarily due to Mr. Washington's assessment of Mr. Kanavich's "employee engagement" skills, which he rated as a score of 1.

31. Mr. Washington alleged Mr. Kanavich did not speak enough in pre-shift meetings and that he had some "strained relationships."

32. Mr. Kanavich was never previously informed of any concerns related to his engagement in pre-shift meetings or relationships with his coworkers. Therefore, Mr. Kanavich had no opportunity to improve in this category.

33. Additionally, Mr. Washington gave Mr. Kanavich a 1 score in the category of "Execute and adopt specific technology, engineering and operating initiatives to achieve," despite commenting, "[o]verall you've accepted new technology well."

34. Upon information and belief, Mr. Washington intentionally provided Mr. Kanavich with a low rating to drop his average score below a 2 and trigger this PIP.

35. Following his placement on the April 2021 PIP, Mr. Kanavich spoke with Mr. Washington about his disability (*i.e.,* Asperger syndrome), how his disability prevented him from reading social situations properly and fully relating to or engaging socially in the same way as his peers.

36. In short, Mr. Kanavich explained in detail with Mr. Washington why his disability impacted his low-scoring categories in his performance review and his needs for accommodations for his disability. During this conversation, Mr. Washington refused to engage in the interactive process to reasonably accommodate Mr. Kanavich, as required by the ADA and PHRA.

37. Mr. Washington never addressed Mr. Kanavich's disclosure of his disability further, never reported Mr. Kanavich's disability to other management personnel, and never informed Mr. Kanavich to notify additional parties.

38. Upon information and belief, Mr. Washington took steps to hide Mr. Kanavich's disability and his requests for accommodations from other management-level employees who worked for Defendant.

39. Mr. Kanavich's requests for accommodation were clear, specific, and could have been reasonably accommodated if not for XPO and Mr. Washington's failure to engage in the interactive process.

40. Following the disclosure of his disability, Mr. Kanavich was held to different performance standards from his non-disabled peers by Mr. Washington and continued to be provided with a disproportionate amount of work compared to his non-disabled coworkers.

41. Upon information and belief, Mr. Washington assigned Mr. Kanavich additional duties compared to his counterparts to intentionally exacerbate his disability.

42. On or about June 2, 2021, Mr. Kanavich emailed Mr. Laugh and requested assistance regarding yard efficiency and compliance due to his lack of training.

43. The following day, Mr. Laugh informed Mr. Kanavich via email that Mr. Washington would instruct Mr. Kanavich on proper compliance. Mr. Washington never trained or attempted to assist Mr. Kanavich.

44. In August of 2021, Mr. Kanavich returned from approved vacation time. Mr. Kanavich noticed he had been removed from his previously assigned runs. Rather, Mr. Kanavich was now assigned to run "long-distance day lanes." Mr. Kanavich received no indication that his job performance was lacking or that standards were unmet.

45. On August 30, 2021, Mr. Kanavich was called into a meeting with Mr. Laugh and Human Resources Representative, Marissa Wiley (hereinafter, "Ms. Wiley").

46. Mr. Laugh cited zones as justification for his termination and stated they were a "disaster."

47. Significantly, Mr. Kanavich told Mr. Laugh and Ms. Wiley that zones were to be managed by Mr. Washington.

48. Mr. Kanavich also disclosed to Mr. Laugh and Ms. Wiley his formal diagnosis of Asperger syndrome.

49. Mr. Kanavich reiterated the impact his disability has on his social engagement skills and requested to be transferred to a different position in lieu of termination.

50. Despite Mr. Kanavich's requests for accommodation due to his disability, XPO gave Mr. Kanavich no further opportunity to remain employed by the company.

51. Thus, Mr. Kanavich was terminated from his position on August 30, 2021, nearly four months after disclosing his disability to Mr. Washington and requesting reasonable accommodations.

## COUNT I
## DISCRIMINATION IN VIOLATION OF THE ADA AND PHRA

52. Plaintiff incorporates the allegations contained in the above paragraphs as if fully set forth at length herein.

53. Under the ADA, employers are prohibited from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA also provides that discrimination occurs when an employer does "not mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer]." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (quoting 42 U.S.C. § 12112(b)(5)(A)) (emphasis added).

54. To establish a prima facie case of discrimination under the ADA, Plaintiff must show: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of his job, with or without reasonable accommodations by the employer; and (3) he suffered an otherwise adverse employment decision as a result of discrimination. *Lackey v. Heart of Lancaster Reg'l Med. Ctr.*, 704 F. App'x 41, 48 (3d Cir. 2017)(citing *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177,185 (3d Cir 2010)).

55. The PHRA is modeled similarly to the ADA and shares similar burdens. The analytical framework used to evaluate a disability discrimination claim under the PHRA is effectively indistinguishable from that under the ADA, thus allowing courts to dispose of both ADA and PHRA claims on the same grounds. *Bialko v. Quaker Oats Co.*, 434 F. App'x. 139, 142 n.5 (3rd Cir. 2011) (citing *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002) (noting that the PHRA, in all "relevant respects," was "basically the same as the ADA" and was interpreted "in accord" with the ADA and related case law, thus meaning that "disposition of [plaintiff's] ADA claim applie[d] with equal force to his PHRA claim.")

56. Asperger's Disorder is a disability within the meaning of the ADA.

57. Plaintiff was qualified to successfully perform the necessary functions of his job.

58. Plaintiff disclosed his disability to his supervisor and manager, Mr. Washington, following a poor performance review based solely on Plaintiff's social interactions with other employees.

59. Upon information and belief, Mr. Washington intentionally triggered a second PIP by purposely giving Plaintiff a poor rating.

60. Plaintiff disclosed his disability and requested accommodations to Mr. Washington.

61. Plaintiff suffered the ultimate adverse employment action when Defendant terminated him after he further disclosed his disability and requested a reasonable accommodation in lieu of termination.

62. As set forth hereinabove, the Defendant's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

63. As a direct and proximate cause of the aforementioned conduct, Plaintiff suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in his favor and against Defendant, including an award of back pay, front pay, any other compensatory and punitive damages, costs and reasonable attorney's fees.

## COUNT II
## FAILURE TO ACCOMMODATE IN
## VIOLATION OF THE ADA AND THE PHRA

64. Plaintiff incorporates the allegations contained in the above paragraphs as if fully set forth at length herein.

65. To prevail on a claim of failure to accommodate, Plaintiff must establish that "(1) the employer knew about his disability; (2) he requested accommodations or assistance for his disability; (3) the employer did not make a good faith effort to assist him in seeking accommodations; and (4) he could have been reasonably accommodated but for the employer's lack of good faith." *Tourtellotte v. Eli Lily & Co.*, 636 F.App'x 831, 849 (3d Cir. 2016) (internal citations omitted).

66. Plaintiff made Defendant aware of his disabilities and therefore Defendant possessed knowledge of Plaintiff's disability.

67. Plaintiff requested reasonable accommodations for his disability.

68. Plaintiff could have been readily and reasonably accommodated by Defendant for his disability, however Defendant failed to provide even a modicum of good faith or a willingness to engage in the accommodations interactive process.

69. Rather, Defendant placed Plaintiff on a second PIP due to his social impairment and ultimately terminated him.

70. As set forth hereinabove, Defendant's actions were intentional, knowing, wanton, willful and so outrageous as to shock the conscience, such that the imposition of punitive damages are appropriate.

71. As a direct and proximate cause of the aforementioned conduct, Plaintiff suffered actual damages, including but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in his favor and against Defendant, including an award of back pay, front pay, any other compensatory and punitive damages, costs and reasonable attorney's fees.

## COUNT III
## RETALIATION IN VIOLATION OF THE ADA AND THE PHRA

72. Plaintiff incorporates the allegations contained in the paragraphs above as if fully set forth at length herein.

73. The ADA prohibits employers from retaliating against employees. 42 U.S.C. § 12203(a). The ADA prohibit employers from retaliating against employees. 42 U.S.C. §12203(a). To establish a claim for retaliation, a plaintiff must prove, "(1) that he engaged in a protected employee activity; (2) that he was subject to an adverse action by the employer either subsequent or contemporaneous with the protected activity; and (3) that there is a causal connection between

the protected activity and the adverse actions." *Lackey v. Heart of Lancaster Regl. Med. Ctr.*, 704 Fed. Appx. 41, 49-50 (3d Cir. 2017) (citing *Williams v Phila. Hous. Auth. Police Dep't,* 380 F.3d 751, 759 (3d Cir. 2004).

74. Plaintiff engaged in the protected employee activities of disclosing his disability and requesting the reasonable accommodation of a change in position.

75. Following Plaintiff's requests for reasonable accommodations, Plaintiff was subsequently and nearly contemporaneously terminated from his position.

76. Defendant's actions can only be viewed as retaliatory and possessing a causal connection to Plaintiff's requests for reasonable accommodations.

77. As a direct and proximate cause of the aforementioned conduct, Plaintiff suffered actual damages, including but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

78. As set forth hereinabove, the Defendant's actions were intentional, knowing, wanton, willful and so outrageous as to shock the conscience.

WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in his favor and against Defendant, including an award of back pay, front pay, any other compensatory and punitive damages, costs and reasonable attorney's fees.

**JURY TRIAL DEMANDED.**

                              Respectfully submitted,

                              <u>/s/ Sammy Sugiura, Jr.</u>
                              Sammy Sugiura, Jr.
                              PA I.D. No. 209942
                              sammys@jpward.com
                              J.P. WARD & ASSOCIATES, LLC
                              201 SOUTH HIGHLAND AVE
                              SUITE 201
                              PITTSBURGH, PA 15206
                              TELEPHONE: (412) 545-3016
                              FACSIMILE: (412) 540-3399

                              **COUNSEL FOR PLAINTIFF**